IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br><br>vs.<br><br><br>OSCAR DELGADILLO, EDUARDO BANUELOS-BARRAZA aka CARLOS BETANCOURT, and JUAN CABRERA-SAUCEDO aka ALFREDO DELEON,<br><br>Defendants. | ORDER<br><br>AND<br><br>MEMORANDUM DECISION<br><br><br>Case No. 2:09-CR-108-TC |

The three defendants have been charged with knowingly and intentionally possessing, with intent to distribute, five hundred grams or more of cocaine. They move to suppress evidence and statements obtained by the government through the February 5, 2009 traffic stop and search of the GMC Yukon sport utility vehicle (SUV) in which the defendants were traveling.[1]

They assert that the government violated their Fourth Amendment rights to be free of unlawful detention and unreasonable searches. Specifically, they contend that (1) the traffic stop was illegal because the highway patrolman did not have reasonable articulable suspicion, much less probable cause, to believe a traffic violation had occurred; (2) the officer's reasons for the

---

[1](See Delgadillo Mot. Suppress (Docket No. 67); Cabrera-Saucedo Mot. Suppress (Docket No. 64); Banuelos-Barraza Mot. Suppress (Docket No. 62).)

traffic stop were pretextual; (3) the officers illegally detained the defendants because the detention was unnecessarily prolonged without reasonable articulable suspicion of criminal activity; (4) the consent to search the SUV was not voluntary; and (5) the officers did not have probable cause to search the SUV.[2]

Because the court finds that the traffic stop was valid, the detention was based on reasonable articulable suspicion, and the consent to search the SUV was voluntary, the court DENIES the motions to suppress.

### FINDINGS OF FACT[3]

Just after midnight on February 5, 2009, Sergeant Robert B. Nixon III of the Utah Highway Patrol (UHP)[4] was on duty in his patrol car on Interstate 15, a known corridor for smuggling illegal narcotics across the country. Sergeant Nixon is, and was at all relevant times, assigned to UHP's Criminal Interdiction Team, which primarily focuses on apprehending drug smugglers through a high volume of traffic stops on known drug pipelines.[5] He has received specialized training over the years concerning interdiction of the illegal transport of contraband,

---

[2]Defendant Juan Cabrera-Saucedo initially moved the court to "suppress any statements made by the Defendant that were obtained after he was appointed counsel in his corresponding state case." (Mot. Suppress (Docket No. 64) at 1.) Although some testimony was elicited during the evidentiary hearing concerning this issue, Mr. Cabrera did not raise this point in his supporting memorandum or during final argument. Accordingly, the court does not address it.

[3]Unless otherwise noted, the facts are taken from the testimony and evidence admitted during the June 23, 2009 evidentiary hearing on the Defendants' motions to suppress. (See June 23, 2009 Tr. of Evidentiary Hr'g on Defs.' Mots. Suppress (Docket No. 80) ("Tr.").)

[4]Sergeant Nixon has been with the UHP for eight years.

[5]He has been with the team approximately three and a half years.

primarily illegal narcotics.[6]  For instance, he was trained to recognize "indicators"[7] of criminal

activity, methods for hiding illegal drugs, and hidden compartments or "natural voids" in

vehicles where illegal drugs can be stashed for transport.  Now he is an instructor throughout the

state of Utah in the area of criminal interdiction.

　　　　While on duty that night in his patrol car, as he crossed the I-15 median to drive north,

Sergeant Nixon pulled up behind a northbound GMC Yukon with an Illinois license plate.  Their

location on I-15 was in a rural area (i.e., Washington County, Utah, near the border of Utah and

Arizona).  The night was clear, the road was dry, and there were no adverse weather conditions.

Traffic was light but constant.

　　　　As Sergeant Nixon followed the SUV for approximately one and half miles, he watched

the SUV move across the painted lane divider three separate times.  (See Tr. 86-87.)  Sergeant

Nixon testified that he was concerned because he "noticed the vehicle was plated out of Illinois,

and the – often people that travel across the country, it's a danger.  They try pushing it and get

tired, and we get quite a bit of crashes in the rural areas for people that – fatigued drivers falling

asleep at the wheel."  (Tr. 17.)

　　　　After the SUV drifted out of the lane of traffic the third time, Sergeant Nixon turned on

his emergency lights and pulled the SUV over.  In addition to his concern about a fatigued driver

(see, e.g., Tr. 87), he said that drifting across lanes was a violation of Utah traffic law section 41-

---

　　　　[6]He also receives up-to-date information from two information e-mail networks
concerning pipeline-related seizures and arrests (one containing information from officers across
the country and one specific to significant pipeline seizures in Utah).

　　　　[7]According to Sergeant Nixon, an "indicator" is "something that myself as an officer may
see, smell or sense that in and of itself is – may seem innocent, but when put together with the
totality of the circumstances leads me to believe something illegal is going on."  (Tr. 11.)

6A-710 (prohibiting improper lane travel).

Turning on the patrol car's emergency lights activated video equipment that recorded the stop, detention, questioning, search, and arrest.  (See Gov't Ex. 1 (DVD).)  But the three moving violations observed by Sergeant Nixon were not captured on video.

The Defendants challenge Sergeant Nixon's credibility on this issue, questioning the veracity of his testimony about the reasons for the stop.  They note that Sergeant Nixon did not manually turn on the video recorder when following the SUV, so the weaving was not recorded.  But Sergeant Nixon testified on cross-examination that failing to do so was simply an oversight.  Nothing in the record suggests otherwise.  The driver did not deny weaving and had no explanation for the second and third times he weaved.  Based on the court's review of the record, including the DVD recording, and the court's observation of Sergeant Nixon's demeanor and responses on the witness stand, the court finds that Sergeant Nixon was a credible witness.  This finding is bolstered by the fact that no evidence contradicts Sergeant Nixon's testimony (indeed, the DVD actually corroborates his testimony).[8]  Accordingly, the court has no reason to question the evidence that the driver weaved three times.

Sergeant Nixon walked up to the passenger side of the SUV and saw three men, two in the front seat and one in the back.  The driver was Defendant Eduardo Banuelos-Barraza, also known as Carlos Betancourt (the court hereinafter refers to him as Mr. Banuelos).  Defendant Oscar Delgadillo was a passenger in the front seat.  Defendant Juan Cabrera-Saucedo, also known as Alfredo DeLeon, was the backseat passenger (the court hereinafter refers to him as Mr.

---

[8]Defendants challenge Sergeant Nixon's credibility on a separate issue as well, which the court addresses below.

Cabrera).

The front passenger-side window was rolled down, and as Sergeant Nixon stopped next to the SUV window, he immediately smelled a strong odor of air freshener. He then asked the driver for his driver's license. Mr. Banuelos handed Sergeant Nixon an Illinois driver's license in the name of Carlos Betancourt. The photograph on the license appeared to be that of the driver (Mr. Banuelos). Sergeant Nixon said that Mr. Banuelos's hand "was shaking very noticeably" as he provided his driver's license. (Tr. 20.)

Sergeant Nixon told the driver that he had watched the SUV drift across the lane divider three times, in violation of Utah law. He also said he was concerned about their safety, and asked Mr. Banuelos whether he "was tired and if he was okay to drive." (Id. at 21.) Mr. Banuelos said he was "fine." (Id.) Sergeant Nixon testified that Mr. Banuelos appeared tired but "did not appear impaired at all as if he was on alcohol or anything else. I was not suspicious of that." (Id.)

Sergeant Nixon also asked for registration papers and proof of insurance. Mr. Banuelos produced an insurance card but did not produce the registration.[9] Then Sergeant Nixon told Mr. Banuelos he was going to issue a warning and asked Mr. Banuelos if he would be willing to sit in the patrol car so Sergeant Nixon could get more information. Mr. Banuelos agreed.

When they got into the patrol car, Sergeant Nixon called dispatch on his radio, asked for a "records check" by using the driver's license number of "Carlos Betancourt" (Tr. 23), and began

---

[9]During a post-arrest search of the SUV, officers found the registration, but they did not receive anything before then and were not aware (and had no reason to be aware) of its existence at the relevant times. (See Tr. 65- 66.)

5

typing up a warning citation.  The records check included a driver's license check and a check on

"wants and warrants."  (Id.)

Sergeant Nixon again explained to Mr. Banuelos that he was getting a citation for

weaving three separate times.  Mr. Banuelos provided a vague explanation about why he weaved

the first time, but he did not deny the weaving and had no explanation for the second and third

times he crossed the dividing line.

As Sergeant Nixon typed up the citation and waited for a response from the dispatcher, he

asked Mr. Banuelos some questions about the traveling companions and their travel plans.

Mr. Banuelos said "they were on their way home to Chicago coming from Los Angeles at

that time," where they had gone to attend a quinceañera (a Latin American coming-of-age

ceremony for a fifteen-year-old girl).  (Tr. 24.)  When asked whose party it was, he first

mentioned something about "his sister's nephew" and then said the party was for "his sister's

friend" but he did not know the girl's name.  (Id. at 24-25.)  In fact, he said none of the three men

knew the girl.  During the evidentiary hearing, when Sergeant Nixon was asked, "Was it

awkward for [Mr. Banuelos] telling you about this party?," he responded, "It was.  The more I'd

ask about it, he would hesitate, and his answers did not appear to – did not appear to be a true

story."  (Id. at 25.)

Sergeant Nixon asked how the three men knew each other.  At one point, Mr. Banuelos

told Sergeant Nixon that Mr. Delgadillo was his friend and that Mr. Cabrera was his cousin.  But

later Mr. Banuelos said that Mr. Cabrera was his friend.  When Sergeant Nixon reminded Mr.

Banuelos that the answer was inconsistent with his earlier response, Mr. Banuelos provided a

vague response about being related through marriage.

During the time Mr. Banuelos was in Sergeant Nixon's car, he showed signs of nervousness.  Sergeant Nixon testified that, in his experience, a person's initial nervousness typically subsides once the person learns he is only receiving a warning citation.  But Mr. Banuelos "continued to be nervous.  His - when I would speak with him and he would answer, it was almost as if he was staring at a distance, and was unable to sit still in my vehicle.  He just seemed very uncomfortable and shifted quite a bit." (Tr. 30.)

As Sergeant Nixon heard about the men's travel plans, he became more suspicious.  For instance, he stopped the three men on a Thursday very early in the morning.  Mr. Banuelos told the officer that they had left Illinois "either Sunday or Monday" (but he was not sure which day).[10]  (Tr. 26.)   Mr. Banuelos said they had traveled from Chicago to Los Angeles to attend the quinceañera , and then, during the same trip, had stayed in Las Vegas for two days where they had gone to another party.  Sergeant Nixon found the itinerary incredible because at that point, they had been stopped in Utah just north of the Arizona border and were purportedly driving back to Chicago in the early morning hours of Thursday.

When Mr. Banuelos was asked whose car he was driving, he said the car was owned by Mr. Delgadillo's wife, Crystal Sanchez.  (Later during the stop, Mr. Delgadillo told Sergeant Nixon that he was too tired to drive so he let Mr. Banuelos drive.  That statement was captured on the video.)

About seven minutes after Sergeant Nixon had stopped the men, the dispatcher responded to Sergeant Nixon's initial request for a check on Mr. Banuelos's license, stating that there was

---

[10]Sergeant Nixon confirmed that Mr. Banuelos was referring to the Sunday or Monday just before the stop, not the previous week.

no record on file for that number.  Sergeant Nixon then asked the dispatcher to check based on the name and date of birth on the driver's license.

While waiting for the dispatcher's response, Sergeant Nixon decided to speak to the passengers.  After asking Mr. Banuelos if it would be okay to speak with the two passengers (to which Mr. Banuelos responded that it would be fine), he left Mr. Banuelos in his patrol car and went back to the SUV.  When the officer was asked "why" on the stand, he said, "A couple of reasons.  One, I was suspicious of criminal activity going on.  I wanted to see what [Mr. Delgadillo's] story was.  Also at that point my dispatch could not find a driver's license and I wanted to see if [Mr. Delgadillo] had one."  (Tr. 32-33.)

At Sergeant Nixon's request, Mr. Delgadillo voluntarily got out of the SUV and handed Sergeant Nixon an Illinois driver's license.  According to Sergeant Nixon, he asked Mr. Delgadillo to get out of the SUV because he was suspicious that Defendants were involved in criminal activity:

> [I]f there was, I wanted to [hear Mr. Delgadillo's] story of the purpose of their travels and [ask] the same similar questions I asked [Mr. Banuelos].  I did not – if there was something going on, I did not want them to be able to corroborate their story by the [backseat passenger] hearing [Mr. Delgadillo's] answers.

(Tr. 34.)

Mr. Delgadillo said they had gone to Las Vegas and then to Los Angeles.  "I asked him why they had gone to Los Angeles.  He stated that to make a couple stops to see some friends, and then just to go."  (Tr. 35.)  Mr. Delgadillo did not mention a quinceañera, was not able to tell Sergeant Nixon when the three men had left Illinois, and said the three men had been together the entire trip.

At that point, about nine minutes into the stop, Sergeant Nixon heard on his hand-held radio from the dispatcher that they were still not able to find record of any such driver's license but that an individual named 'Carlos Betancourt' with the date of birth provided had several drug-related convictions.

Then Sergeant Nixon, using his hand-held radio, asked the dispatcher to check Mr. Delgadillo's driver's license.  After an unsuccessful attempt to reach dispatch (his hand-held radio was not working properly), Sergeant Nixon told Mr. Delgadillo to wait while he used his car radio to call in Mr. Delgadillo's driver's license number.  Mr. Delgadillo got back into the SUV.

By that time, another UHP trooper, Chad Hecker, had arrived on the scene and was parked behind Sergeant Nixon's patrol car.

Sergeant Nixon got back in his car and again asked the dispatcher to check the validity of Mr. Delgadillo's license.  While waiting for a response, Sergeant Nixon called Utah Highway Patrol Trooper Russell Whittaker (who worked with the UHP canine team) on his cell phone and asked for a drug-sniffing dog.  He then entered the SUV's license plate number into the computer system to get the registration information, which showed the SUV registered to Crystal Sanchez and Armando Duran, neither of whom was in the SUV.

Sergeant Nixon went back to speak to Mr. Delgadillo about the SUV's registration information and ask why Crystal Sanchez, purportedly Mr. Delgadillo's wife, had a different last name.  Mr. Delgadillo responded that "they were separated and fighting.  He didn't want her to have his last name."  (Tr. 44.)

Mr. Delgadillo also stated that all three men had stayed together at a Comfort Inn in Los

Angeles.  When Sergeant Nixon later asked Mr. Banuelos the same question, Mr. Banuelos

responded that he had stayed at his sister's house while Mr. Delgadillo and Mr. Cabrera stayed

somewhere else.  Mr. Banuelos also said the three men had separated while in Los Angeles and

had done different things.

Approximately five to six minutes after Sergeant Nixon's request for validation of Mr.

Delgadillo's license, the dispatcher responded that Mr. Delgadillo's driver's license was valid.

At that point (about twenty minutes into the stop), Sergeant Nixon gave Mr. Banuelos the

warning for improper lane travel, returned all of the documents (including Mr. Delgadillo's

driver's license) to Mr. Banuelos, and asked Mr. Banuelos if he had any questions.

Sergeant Nixon admitted that if the men had begun to leave at that point, he would not

have let them go because he felt he had sufficient suspicion to detain them longer while waiting

for the drug-sniffing dog to arrive.  It also appears from the sequence of events shown on the

video that Mr. Delgadillo did not immediately get his driver's license back.  At that point he

certainly would not have been aware that Sergeant Nixon had returned all of the documents to

Mr. Banuelos (he was in the SUV when Sergeant Nixon handed Mr. Banuelos the papers in the

patrol car).

As Mr. Banuelos began to get out of the patrol car, Sergeant Nixon asked him if he would

be willing to answer a few more questions.  Mr. Banuelos agreed and got back into the patrol car.

In response to further questioning, Mr. Banuelos said the quinceañera was not the reason

for the trip.  Instead, he said they had taken the trip to attend a funeral for someone known by Mr.

Delgadillo.  Sergeant Nixon testified that Mr. Banuelos "was very hesitant in his answers.  It was

very confusing and I didn't understand what he was talking about.  He appeared to be fabricating

the story."  (Tr. 48.)

Sergeant Nixon then asked Mr. Banuelos if he had anything illegal in the SUV, such as explosives, weapons, narcotics (specifically marijuana, cocaine, heroin, or methamphetamine), or large amounts of cash.  Mr. Banuelos said no to each.

Then Sergeant Nixon asked Mr. Banuelos for permission to search the SUV.  "[H]e said that I could.  But then he stated that it was . . . Delgadillo's vehicle.  I confirmed with him, I said – I explained to him I was going to go talk to Delgadillo [to confirm Mr. Banuelos's answers and to get permission to search], but wanted to make sure he was okay with me searching the vehicle, and he stated that he was fine with that."  (Tr. 49, 51.)

Sergeant Nixon went up to Mr. Delgadillo in the SUV, and asked him if he would be willing to answer more questions.  Mr. Delgadillo agreed, and Sergeant Nixon asked the same questions about contraband in the SUV.  Sergeant Nixon did not learn anything new or receive any further contradictory information.  When he asked Mr. Delgadillo whether he could search the SUV, Mr. Delgadillo responded, "'Yeah.'"  (Tr. 52.)

Sergeant Nixon did not raise his voice, use physical force, draw a weapon, or threaten Mr. Banuelos or Mr. Delgadillo in any way.  All this time, the other officer was back with his patrol car, waiting.

After receiving consent from both Mr. Banuelos and Mr. Delgadillo, Sergeant Nixon asked all three men to stand outside the SUV during the search.  (Approximately twenty-five minutes had elapsed.)  Trooper Whittaker arrived with "Justice," a UHP certified drug-detecting

11

dog,[11] only a few minutes after Sergeant Nixon received consent to search.  Sergeant Nixon did

not begin searching the SUV until Justice arrived, circled the SUV, and "alerted"[12] twice that it

smelled drugs at the back of the SUV underneath the rear bumper.  Sergeant Nixon (who is a

former dog handler and an instructor trained to certify drug-sniffing dogs, including Justice) said

that he personally saw Justice "alert" twice on the exterior of the SUV.[13]  Trooper Whittaker also

put Justice inside the SUV and then told Sergeant Nixon that Justice "indicated" at the center

console of the SUV.

     Defendants again question Sergeant Nixon's credibility by contending that the video

recording contradicts Sergeant Nixon's direct testimony that he watched Justice alert twice at the

---

[11](See Jan. 30, 2009 State of Utah Certification of K-9 Justice as Narcotics Detector Dog (Docket No. 82-2) (added to record based on order granting United States' motion to supplement).)

[12]By "alert," Sergeant Nixon meant the dog showed some interest in the underside of the SUV.  (See Tr. 81, 94.)  He explained the difference between "alerting" and "indicating":

> When a dog smells odor, it's kind of in a cone.  Kind of like the source of the odor is right there and it will spread out.  When a dog indicates, he's pinpointed that odor, and he's scratching on it.  When he's alerting, he's in that cone pattern, he's in that cone, and works his way into that odor to where if it's strong enough he will indicate on the odor.

(Tr. 82.)  He agreed that alerting behavior can vary among dogs and that the personal handler is the one most able to recognize the sign of an alert.  But Sergeant Nixon was also personally familiar with Justice (he had originally certified Justice as a canine sniffing dog) and could recognize when Justice alerted.  (Id. at 82-83 ("When he alerted to it, he head checked it.").)

[13]Sergeant Nixon explained: "I observed [Justice] make alerts because I was at the front of my vehicle, the rear of the suspect vehicle, so I did observe that.  I didn't see him go around the entire vehicle because I didn't watch him do that.  I did see him on the rear though."  (Tr. 104-05.)  He described Justice's alert:  "At one point he was – he was sniffing along the rear bumper, and at one point he stuck his head up below the bumper.  Which when he's sniffing, he's just sniffing along the line, and it was an obvious moment to where he went up underneath, went in after an odor it appeared to be."  (Id. at 106.)

back of the SUV.  They contend that the video shows he was actually distracted by his search of a

backpack at the time of the alerts.  But Defendants are mistaken.  If one views the entire DVD

carefully, it becomes apparent that Justice actually alerted three times.  From the video, it is clear

that Sergeant Nixon is watching Justice at the time Justice alerted twice in a row.  At that point in

the video, Sergeant Nixon and the dog-handler comment to each other about the first two times

Justice alerts (the alerts are subtle but visible).  Specifically, the dog-handler notes after the

second alert that the dog's subtle head check (a dipping of the head) was "the second time he's

done that," and Sergeant Nixon responded, "Yeah. I saw it the first time."  (See Gov't Ex. 1 at

00:27 to 00:28.)  Approximately two to three minutes later, when Sergeant Nixon searches a

backpack, Justice alerts a third time and the dog-handler says something to Sergeant Nixon about

it.  (See id. at 00:30.)  This is completely consistent with Sergeant Nixon's testimony and the

court finds him credible.

　　　　After Justice alerted at the SUV's back bumper, Sergeant Nixon looked at the spare tire

attached to the underside of the SUV in the back.  "We looked up underneath and . . . could see

that the spare tire had been – had hand prints on it.  They appeared to be fresh finger marks and

hand prints on it."  (Tr. 58.)  He performed what he called an "echo test" on the tire by listening

to the tire with a stethoscope while tapping on the tire.  "[I]f it's empty, a full echo goes

throughout. . . .  If it has something inside it that is blocking that echo, it will be more of a thud

sound.  And on this occasion I heard more of the thud sound."  (Id. at 58-59.)

　　　　But the officers disagreed about the results of the echo test, so they removed the spare tire

(with some difficulty).  Sergeant Nixon held the tire a few inches off the ground and dropped it,

at which point he "could hear loose objects inside the tire."  (Tr. 59.)  Based on his training and

experience, he "believed there was illegal contraband inside that tire." (Id. at 60.)  The troopers

then arrested all three men.  Later, when the officers opened up the spare tire, they found cocaine.

The Defendants were detained for approximately twenty minutes before the search, and

then another thirty-five minutes before they were arrested, resulting in a detention lasting

approximately fifty-five minutes.

### CONCLUSIONS OF LAW

Defendants challenge the traffic stop, the detention, and the search.  Before reaching the

merits, the court must resolve the threshold standing issue raised by the government.

**<u>Standing</u>**

The government contends that none of the Defendants (including Mr. Banuelos, the

driver) has standing to challenge the search of the SUV.[14]

To determine whether a party has standing, the court must consider "(1) whether the

defendant has manifested a <u>subjective expectation</u> of privacy in the object of the challenged

search, and (2) whether that expectation of privacy was <u>objectively reasonable</u>."  <u>United States v.

Gama-Bastidas</u>, 142 F.3d 1233, 1239 (10th Cir. 1998) (emphasis added).  The defendant bears

the burden of establishing standing.  <u>United States v. Valdez Hocker</u>, 333 F.3d 1206, 1209 (10th

Cir. 2003).

> To establish standing to challenge a car search the defendant bears the burden of
> showing that he had a legitimate possessory interest in or a lawful control over the
> car.  Because the focus of the inquiry is on reasonable expectations, however, a

---

[14]The parties do not dispute that each of the Defendants has standing to challenge the
traffic stop and his own detention. <u>See, e.g.</u>, <u>United States v. Erwin</u>, 875 F.2d 268, 270 (10th Cir.
1989) (holding that passenger has Fourth Amendment interest in seizure of his person—which
includes a traffic stop—so passenger had standing to challenge stop and detention).

> defendant need not submit legal documentation showing a chain of lawful custody
> from the registered owner to himself.

Id. (internal citations and quotations marks omitted).

The court agrees that Mr. Cabrera does not have standing to challenge the search.  There is no evidence that Mr. Cabrera had any possession of or property interest in the SUV.  He was a backseat passenger with no proven connection to the registered owners.  See United States v. Gama-Bastidas, 142 F.3d 1233, 1239 (10th Cir. 1998) (holding that passenger who does not assert possessory or property interest in car does not have legitimate expectation of privacy in car and so does not have standing to challenge search of car).

But the court finds that both Mr. Delgadillo and Mr. Banuelos have established standing to challenge the search.  "Whether a driver's privacy interest in an automobile is reasonable depends on the driver's lawful possession of the vehicle."  United States v. Soto, 988 F.2d 1548, 1552 (10th Cir. 1993).  "Where the proponent of a motion to suppress is the car's driver but not the registered owner, mere possession of the car and its keys does not suffice to establish a legitimate possessory interest.  Rather, at a minimum, the proponent bears the burden of establishing that he gained possession from the owner or someone with authority to grant possession."  Valdez Hocker, 333 F.3d at 1209 (internal citation omitted).

The government contends that Mr. Banuelos and Mr. Delgadillo, neither of whom testified during the evidentiary hearing, have not met their burden.  But the fact that the two Defendants did not testify is not necessarily dispositive of the issue:

> The proponent of a motion to suppress bears the burden of demonstrating his
> standing to challenge the search.  Although defendant did not testify at the
> suppression hearing, the record indicates that when questioned by Officer Barney,
> defendant asserted that the car was owned by his uncle, Mr. Corral, who had

loaned him the car. The registration produced by defendant bore Corral's name, and a computer check on the vehicle revealed that it had not been reported stolen. Thus, . . . defendant here claimed to have borrowed the car from the rightful owner, and produced a registration bearing that individual's name. Although this evidence is not determinative of defendant's right to possess the vehicle, absent evidence that defendant wrongfully possessed the vehicle it is sufficient to confer standing on him to challenge the subsequent search of the car.

Soto, 988 F.2d at 1553.

Here, the court finds that uncontested evidence from the hearing is sufficient to establish standing for both men. First, Sergeant Nixon testified that the SUV's registration listed Crystal Sanchez as one of the registered owners of the SUV. Second, the video of the stop contains uncontroverted statements by Mr. Banuelos and Mr. Delgadillo that Mr. Delgadillo borrowed the car from his wife Crystal Sanchez and that Mr. Banuelos was driving the car at the request of Mr. Delgadillo, who Mr. Banuelos believed owned the SUV.

This case is somewhat similar to Valdez Hocker, in which the court held that the driver had standing even though he borrowed the car from someone other than the registered owner, because the driver reasonably believed the lender had a familial relationship with the registered owner and had authority to lend him the car. 333 F.3d at 1209-10. The Valdez Hocker court also noted that if the defendant had claimed he personally obtained possession from the registered owner, as Mr. Delgadillo did, "he would 'plainly have a reasonable expectation of privacy in the vehicle and standing to challenge the search of the vehicle.'" Id. at 1209 (quoting United States v. Rubio-Rivera, 917 F.2d 1271, 1275 (10th Cir. 1990)).[15]

---

[15]The government's citation to two Tenth Circuit decisions to support its position is not persuasive because the decisions are factually distinguishable. First, in United States v. Allen, 235 F.3d 482 (10th Cir. 2000), the court found that the defendant did not have standing to challenge the search of a car. In two different instances, the defendant was identified as the

For the foregoing reasons, the court finds that Mr. Banuelos and Mr. Delgadillo have established both the subjective and objective components necessary to confirm standing to challenge the search.[16]

**Traffic Stop and Detention**

A routine traffic stop is a seizure within the meaning of the Fourth Amendment, so it is "'subject to the constitutional imperative that it not be 'unreasonable under the circumstances.'"" United States v. Ozbirn, 189 F.3d 1194, 1197 (10th Cir. 1999) (citing Delaware v. Prouse, 440 U.S. 648 (1979), and Whren v. United States, 517 U.S. 806 (1996)). The court must consider the totality of the circumstances. E.g., United States v. Alcaraz-Arellano, 441 F.3d 1252, 1257-58 (10th Cir. 2006). Following the principles set forth in Terry v. Ohio, 392 U.S. 1 (1968), the court must make a dual inquiry: (1) was the traffic stop justified at its inception, and (2) was the detention "reasonably related in scope to the circumstances which justified the interference in the first place." United States v. Mendez, 118 F.3d 1426, 1429 (10th Cir. 1997) (internal citations

---

driver of a brown or maroon car. In the first instance, officers approached the defendant at an address where an anonymous caller said he (and the car) would be located. The defendant was not driving the car and simply said his identification was in the car. In the second instance, during a traffic stop of the defendant driving the car, the defendant fled the scene after the officer said he was going to look for weapons in the car. There was absolutely no evidence that the defendant in that case had any subjective or objective possessory or property interest in the car. In United States v. Arango, 912 F.2d 441 (10th Cir. 1990), the defendant was pulled over for speeding in a pick-up truck. The truck was then searched. The Arango court held that the defendant did not have standing because he failed to show that his possession of the truck was lawful. There, the defendant admitted he obtained possession of the truck from someone other than the registered owner and knew the third person was not the registered owner.

[16]Even if none of the Defendants has standing, the result is the same because the court, as discussed below, is not suppressing evidence obtained during the search.

and quotation marks omitted).[17]

*The Initial Traffic Stop*

The court must initially determine whether Sergeant Nixon had "objectively reasonable articulable suspicion that a traffic violation has occurred or is occurring before stopping the automobile." United States v. Soto, 988 F.2d 1548, 1554 (10th Cir. 1993).

The court finds that the traffic stop here was justified at its inception because weaving over the traffic lane divider is improper lane travel under Utah law. See Utah Code Ann. § 41-6A-710(1)(a)(i) (providing that a driver "shall keep the vehicle as nearly as practical entirely within a single lane").[18]  Alternatively, Sergeant Nixon reasonably concluded—given the out-of-state license plate, the lateness of the hour, and the rural location—that the driver may have been fatigued and so a danger to himself and others. See, e.g., United States v. Zabalza, 346 F.3d 1255, 1258 (10th Cir. 2003) ("Because he witnessed Zabalza's vehicle cross the center line twice, Sergeant Kummer had more than the necessary objectively reasonable, articulable

---

[17]In their brief, Defendants unpersuasively challenge the traffic stop as pre-textual—that is, they contend the stop was illegal because Sergeant Nixon was looking for illegal drugs, not traffic law violators.  The law in the Tenth Circuit does not allow the court to consider a law enforcement officer's subjective reasons or motivation for making a traffic stop.  United States v. Botero-Ospina, 71 F.3d 783, 787 (10th Cir. 1995) (overruling United States v. Guzman, 864 F.2d 1512 (10th Cir. 1988).  The fact that the UHP may have been scouting the I-15 corridor for illegal transport of contraband is not relevant to the court's analysis.

[18]As noted above, the court finds Sergeant Nixon's testimony credible and sufficient to establish that improper lane travel occurred.  Also, the court does not find the case of United States v. Gregory, 79 F.3d 973 (10th Cir. 1996), upon which Defendants rely, persuasive in this context.  The case here is factually distinguishable from Gregory.  In Gregory, the court found no reasonable suspicion to stop a vehicle based on an "isolated incident of a vehicle crossing into the emergency lane of a roadway . . . [where the] road was winding, the terrain mountainous and the weather condition was windy."  Id. at 978.  Here, Sergeant Nixon observed three instances of weaving in a short amount of time along a relatively flat, straight paved road with no inclement weather conditions to interfere.  That was sufficient to justify his stop of the SUV.

suspicion that Zabalza had committed a traffic violation. . . .  Alternatively, at a minimum, Sergeant Kummer's observations were 'sufficient to create a reasonable suspicion that [Zabalza] might be sleepy or impaired, and could present a risk of harm to himself and others.'") (quoting United States v. Ozbirn, 189 F.3d 1194, 1199 (10th Cir. 1999));  United States v. Lloyd, 13 F.3d 1450, 1451 (10th Cir. 1994) (holding that erratic driving—a sudden lane change without signaling and a brief veer a few feet off the side of the road—justified the initial traffic stop to determine whether driver was intoxicated or otherwise impaired).

*Continued Detention*

Having determined that the stop was justified at its inception, the court must now determine whether the actions of Sergeant Nixon were "reasonably related in scope to the circumstances that first justified the interference."  Zabalza, 346 F.3d at 1258.  Given the totality of circumstances, the court finds that the detention did not violate the Defendants' Fourth Amendment rights.

"During a routine traffic stop, the detaining officer may request a driver's license and vehicle registration, run a computer check on the car and driver, and issue a citation.  The detaining officer may also question the vehicle's occupants regarding their identities, travel plans, and ownership of the vehicle."  Zabalza, 346 F.3d at 1259 (internal citations omitted);  see also United States v. Mendez, 118 F.3d 1426, 1429 (10th Cir. 1997) (officer may check whether driver has outstanding warrants and whether the vehicle has been reported stolen).  Even though Sergeant Nixon satisfied himself early in the stop that Mr. Banuelos was not impaired, he had a valid reason to detain the three men further so he could issue the warning citation.  The time that elapsed during the detention (approximately twenty minutes, after which the citation was issued,

19

papers were returned, and Sergeant Nixon obtained consent to search the SUV) was spent

checking validity of driver's licenses and the SUV's registration.[19]

The fact that Sergeant Nixon questioned Mr. Banuelos and Mr. Delgadillo while waiting

to hear from dispatch does not change the analysis because (a) Sergeant Nixon had the right to

ask the questions; and (b) the questioning did not prolong the stop (Sergeant Nixon was waiting

for dispatch to reply to his initial request for a driver's license check). See United States v.

Wallace, 429 F.3d 969, 974 (10th Cir. 2005) (citing Muehler v. Mena, 544 U.S. 93 (2005), and

holding that Fourth Amendment right is not violated if questioning does not extend length of

detention).

Also, at that point, Sergeant Nixon had developed reasonable articulable suspicion

through numerous indicators which, in the aggregate, suggested that criminal activity was

occurring.[20]   Those indicators included the following:  the strong odor of air freshener;

knowledge that I-15 is a substantial drug transportation corridor;  Defendants' initial inability to

produce registration and then information obtained later in the stop indicating that the SUV was

registered to third-parties, neither of whom was in the SUV;  Mr. Banuelos's nervousness

(including the shaking hand), which did not dissipate after he learned he was receiving a warning

---

[19]"In United States v. Sharpe, 470 U.S. 675, 105 S. Ct. 1568, 84 L. Ed. 2d 605 (1985), the Supreme Court declined to set any rigid time limitation on Terry-type stops, concluding instead that it must consider the law enforcement purposes to be served by the stop and the time reasonably needed to effectuate those purposes." United States v. Rutherford, 824 F.2d 831, 834 (10th Cir. 1987) (holding that twenty-five to thirty minutes of detention because of computer problem was still reasonable). See also United States v. Jones, 44 F.3d 860, 872 (10th Cir. 1995) (holding that thirty-minute delay while waiting for response from dispatch was reasonable).

[20]The court notes that deference is to be given "to a trained law enforcement officer's ability to distinguish between innocent and suspicious circumstances." Mendez, 118 F.3d at 1431.

citation;  Mr. Banuelos's and Mr. Delgadillo's inconsistent, vague and sometimes implausible responses to Sergeant Nixon's legitimate questions;  their implausible itinerary; and Mr. Banuelos's lack of a valid driver's license (coupled with dispatch's report that the name and date of birth on the invalid license generated a record showing numerous drug convictions).  In fact, all of these indicators were observed during the time it took for Sergeant Nixon to verify that one of the men had a valid driver's license and to issue the citation.  Once Sergeant Nixon received information that Mr. Delgadillo's license was valid, he immediately returned all of the papers and licenses to Mr. Banuelos and issued the citation.

Sergeant Nixon's reasonable articulable suspicion justified the detention not only during the initial stop but during the search as well.  It is well established that "[a]n investigative detention may be expanded beyond its original purpose . . . if during the initial stop the detaining officer acquires reasonable suspicion of criminal activity."  United States v. Villa-Chaparro, 115 F.3d 797, 801 (10th Cir. 1997) (quotations omitted); see also, e.g., Wallace, 429 F.3d at 976 (officer reasonably prolonged detention to wait for drug sniffing dog because he had reasonable articulable suspicion that the defendants were involved in criminal activity).  In this case, detention was not unreasonably extended.

Furthermore, Sergeant Nixon, upon returning the papers to Mr. Banuelos, obtained Mr. Banuelos's permission to ask more questions.  See, e.g., United States v. Taverna, 348 F.3d 873, 878 (10th Cir. 2003) ("After the initial stop has ended, further questioning by an officer is only permissible if the officer has a reasonable suspicion that the driver is engaged in illegal activity or the driver voluntarily consents to additional questioning. . . .  If the driver voluntarily consents to additional questioning, he is no longer seized for purposes of the Fourth Amendment because

21

he is free to leave.") (emphasis added).

Mr. Delgadillo also consented to further questions.  But even if Mr. Delgadillo was not
aware that Sergeant Nixon had returned his driver's license to Mr. Banuelos, Sergeant Nixon
validly obtained Mr. Delgadillo's consent to answer more questions.  See Soto, 988 F.2d at 1557
("Valid consent may be given by a person being detained.") (citing cases).

Sergeant Nixon's additional questions were brief and prolonged the detention no more
than a couple of minutes.  See, e.g., United States v. Alcaraz-Arellano, 441 F.3d 1252, 1259
(10th Cir. 2006) (holding that questioning unrelated to travel plans and ownership of vehicle "did
not appreciably lengthen the detention and therefore the Fourth Amendment requires no
justification").  Also, as discussed below, he obtained valid consent to search the SUV.  See
United States v. Ozbirn, 189 F.3d 1194, 1200 (10th Cir. 1999) (holding that express consent
validated the continued detention and search even after initial stop had concluded).

**Search of the SUV**

A warrantless search of a vehicle is legal if the person in control of the vehicle voluntarily
consents to the search.  Taverna, 348 F.3d at 878.  The inquiry is a question of fact determined by
looking at the totality of the circumstances.  Id.

The court must apply a two-part test.  First, the court must determine whether the
government has provided clear and positive testimony that the consent was unequivocal, specific,
and freely and intelligently given.  Id.  Second, the court must determine whether the government
has proved that the consent was given without implied or express duress or coercion.  Id.

Here, the government has provided evidence that satisfies the first prong of the test.  Both
Mr. Banuelos and Mr. Delgadillo expressly and positively responded to Sergeant Nixon's request

for consent to search the SUV.

The government has also satisfied the second prong of the test.  There is no evidence of implied or express duress or coercion.  As a general rule, when determining whether a reasonable person would believe he was free to deny an officer's request to search, the court may look at various factors such as:

> the threatening presence of several officers; the brandishing of a weapon by an officer; some physical touching by an officer; use of aggressive language or tone of voice indicating that compliance with an officer's request is compulsory; prolonged retention of a person's personal effects such as identification and plan or bus tickets; a request to accompany the officer to the station, interactions in a nonpublic place or a small enclosed place; and absence of other members of the public.

United States v. Sanchez, 89 F.3d 715, 718 (10th Cir. 1996).

None of the above-listed coercive factors were present in this case.  At the time Sergeant Nixon requested consent to search from both Mr. Banuelos and Mr. Delgadillo, he did not raise his voice, place his hands on either defendant, draw his weapon, or threaten the men in any way. The presence of Trooper Hecker was nominal (he was back with his patrol car, which was parked behind Sergeant Nixon's patrol car), and the parties were parked on the shoulder of an interstate highway with light traffic.  All of the facts support a finding that consent to search was voluntary.

Finally, even if the officers did not obtain valid consent to search the SUV, the totality of the circumstances giving rise to the reasonable suspicion, coupled with the alerts by Justice, provided probable cause to search the SUV.  See, e.g., Wallace, 429 F.3d at 976-77 (holding that even after defendants withdrew consent to search, search was valid because officers had probable cause based on information obtained during detention and fact that drug-sniffing dog signaled its detection of odor of controlled substance); United States v. Rosborough, 366 F.3d 1145, 1152

(10th Cir. 2005) (stating that dog alert provided probable cause to search vehicle).

For the foregoing reasons, the court finds that the troopers' search of the SUV was valid under the Fourth Amendment.

### ORDER

For the foregoing reasons, the Defendants' Motions to Suppress (Docket Nos. 62, 64, & 67) are DENIED.

DATED this 22nd day of October, 2009.

BY THE COURT:

*Tena Campbell*

TENA CAMPBELL
Chief Judge

24